## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

|  |  |
|---|---|
| DANIEL STEWART,<br>DOUGLAS RYERKERK, and<br>WILLIAM KEE, | )<br>)<br>)<br>) |
| Plaintiffs | )   Case No. 3:18-cv-381<br>) |
| v. | )<br>) |
| KNOX COUNTY, TENNESSEE and<br>KNOX COUNTY BOARD OF EDUCATION, | )<br>)<br>) |
| Defendants. | )<br>) |

## COMPLAINT

COME the Plaintiffs, DANIEL STEWART ("Captain Stewart"), DOUGLAS RYERKERK ("Captain Ryerkerk"), and WILLIAM KEE ("Captain Kee") (collectively, "the Captains" or "Plaintiffs"), and sue Defendants KNOX COUNTY, TENNESSEE ("Knox County") and KNOX COUNTY BOARD OF EDUCATION d/b/a KNOX COUNTY SCHOOLS (the "KCS Board") (collectively, "Defendants"), and would show this Honorable Court as follows:

## I. PRELIMINARY STATEMENT

1. This whistleblower case stems from systematic retaliation against Plaintiffs, all experienced security captains overseeing key aspects of the Knox County Schools ("KCS") Security Department, said retaliation being taken by its chief of security, Gus Paidousis ("Chief Paidousis"), and done in collusion with the Knox County Sheriff's Office ("KCSO" or "KCSD").

2. Plaintiffs repeatedly complained about Chief Paidousis. In addition to complaints about the violation of laws designed to protect the health, safety, and welfare, their complaints

-1-

including reporting his intention to violate the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* (the "ADA"), and statements of race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII").

3.    Plaintiffs brought their complaints throughout the governmental hierarchy of Knox County, from Knox County Mayor Tim Burchett, through each of three (3) Superintendents of KCS, and to each and every member of the Board of Education of KCS.  With the exception of one board member, no person took any action to stop Chief Paidousis from engaging in illegal conduct, or to stop his retaliation against the Plaintiffs.

4.    As shown herein, the wrongful actions of Chief Paidousis, the collusion of the KCSO in assisting him to find a pretextual reason to have their employment terminated, and the inaction of the Knox County Mayor, three (3) Superintendents of KCS, and all but one member of the Knox County Board of Education were exacerbated by other complaints of illegalities about Chief Paidousis from numerous other employees of the KCS Security Department, all of whom were also fired.   The pattern of shielding and protecting Chief Paidousis over the safety and security of employees and the children who attend Knox County Schools, all as set forth herein, indicates some level of corruption the extent of which is currently unknown.

## II.  JURISDICTION AND VENUE

5.    The matter in controversy involves questions of federal law, giving this Court original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. § 2000e-5(f)(3).

6.    The matter in controversy also involves ancillary claims that form part of the same case or controversy as those claims within the original jurisdiction of the Court.  This Court has supplemental jurisdiction of such ancillary claims pursuant to the provisions of 28 U.S.C. § 1367.

7. The wrongful conduct alleged herein occurred in Knox County, Tennessee, and venue is therefore proper with this Court pursuant to 28 U.S.C. § 1391.

## III. <u>ADMINISTRATIVE PREREQUISITES & PRIOR SUIT</u>

8. Each of the Plaintiffs filed Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), true and correct copies of the Charges, as amended, being attached hereto as <u>Exhibit A</u>, <u>Exhibit B</u>, and <u>Exhibit C</u>, respectively. On June 28, 2018, the U.S. Department of Justice issued a Notice of Right to Sue to each Plaintiff, true and correct copies of which are attached hereto as <u>Exhibit D</u>, <u>Exhibit E</u>, and <u>Exhibit F</u>, respectively.

9. All administrative prerequisites for filing suit under the ADA and Title VII have been satisfied, less than ninety (90) days have elapsed since the date the Notices of Right to Sue were issued, and Plaintiffs timely file suit under the Federal statutes.

10. Plaintiffs filed suit in Knox County Chancery Court in the case *Davey Sanderson et. al. v. Knox County, Tennessee et. al.*, case no. 193924-3 (the "*Sanderson* lawsuit") on June 9, 2017, thereby tolling the statutes of limitation on their state claims as of that date. The case currently remains pending, and will at the present time remain pending as to Davey Sanderson.

## IV. <u>PARTIES</u>

11. Plaintiff Daniel Stewart is a resident of Campbell County, Tennessee.

12. Plaintiff Douglas Ryerkerk is a resident of Knox County, Tennessee.

13. Plaintiff William Kee is a resident of Blount County, Tennessee.

14. Defendant Knox County, Tennessee, is a political subdivision of the State of Tennessee and may be served with process by and through the County Mayor, City-County

-3-

Building, 400 West Main Street, Suite 615, Knoxville, Tennessee 37902, or the Knox County

Attorney, Richard B. Armstrong, Jr., County Law Director, City-County Building, 400 West Main

Street, Suite 612, Knoxville, Tennessee 37902, or otherwise as provided by law.

15.     Defendant Knox County Board of Education is a statutorily created agency of Knox

County, Tennessee, vested with the management and operation of the Knox County Schools system.

It may be served through its superintendent, Bob Thomas, at 912 South Gay Street, First Floor,

Knoxville, Tennessee 37902, or otherwise as provided by law.

16.     Plaintiffs reserve the right to amend this Complaint with leave of court to name and/or

substitute as defendants any other persons or entities which may later be discovered to be

responsible, in whole or in part, for the wrongful conduct alleged herein.

## V.  <u>FACTS</u>

17.     Paragraphs 1 through 16 are realleged and incorporated in full as if fully set forth.

18.     Defendant was an "employer" as defined by both Title VII and the ADA at all times

relevant to this Complaint.

19.     Plaintiffs were each an "employee" as defined by both Title VII and the ADA

at all times relevant to this Complaint.

20.     The Defendants have in excess of one thousand (1,000) employees. The Defendants

are each an "employer" subject to the provisions of the Tennessee Human Rights Act, Tenn. Code

Ann. § 4-21-101 *et. seq.*

### (A) <u>Background & Employment of the Captains</u>

21.     Captain Stewart has a bachelors degree in business management and is a graduate of

the Tennessee Law Enforcement Training Academy.  He was hired by the [...] Knox County

-4-

Sheriff's Department in 1976 and received his first commission as a bonded Deputy Sheriff at that time. His employment continued until 1996 with the KCSD, with a short break in employment while he worked for a time with the United States Secret Service in Washington, D.C. Captain Stewart received hundreds of hours of law enforcement training while employed by the [...] Knox County Sheriff's Department for some twenty (20) years. Captain Stewart thereafter resigned from KCSD and transferred to KCS in 1996 as a supervisor with the rank of captain in the Security Division. Stewart had no objective prior discipline before he made complaints of illegalities.

22. In responding to Paragraph 21, as stated verbatim in Paragraph 25 in the Complaint filed in the *Sanderson* lawsuit, Knox County and KCS averred in their Answer that, "Defendants are without knowledge or information sufficient to form a belief regarding the truthfulness of the allegations of Paragraph 25 of Plaintiffs' Complaint, and strict proof of the same is demanded." Accordingly, KCS has admitted that they did not review the personnel file of Captain Stewart, and Knox County has admitted that neither the KCSO nor the Knox County Sheriff himself even considered Captain Stewart's background, employment history in law enforcement, or his extensive law enforcement training when they took the adverse actions alleged herein.

23. Captain Ryerkerk is a U.S. Army veteran, serving from 1973-1976 in the active military and nine (9) years in the National Guard. In connection with firearms, Captain Ryerkerk is a POST (Police Officers Standards and Training) certified law enforcement officer. Captain Ryerkerk retired as a Sergeant from the Knoxville Police Department after 29 years of service. He started with the Knox County Schools Security Division in January of 2008. He was a Captain who had supervisory authority over the security of approximately thirty (30) Knox County Schools. Captain Ryerkerk had no objective prior discipline before he made complaints of illegalities.

-5-

24.     In responding to Paragraph 23, as stated verbatim in Paragraph 26 in the Complaint filed in the *Sanderson* lawsuit, Knox County and KCS averred in their Answer that, "Defendants are without knowledge or information sufficient to form a belief regarding the truthfulness of the allegations of Paragraph 25 of Plaintiffs' Complaint, and strict proof of the same is demanded." Accordingly, KCS has admitted that they did not review the personnel file of Captain Ryerkerk, and Knox County has admitted that neither the KCSO nor the Knox County Sheriff himself even considered Captain Ryerkerk's background, employment history in law enforcement, or his extensive law enforcement training when they took the adverse actions alleged herein.

25.     Captain Kee worked for the [...] Knox County Sheriff's Department in 1979 where he was deputized and authorized to carry a firearm as part of his duties. Captain Kee was also instrumental in starting the Blount County Sheriff's Department's Reserve Unit and was a member of that unit where he served for many years as a Lieutenant.  In 1982, Captain Kee began working for Knox County Schools when he was again bonded by the KCSD.  He served as the interim head of security, a campus school security officer, and a transportation investigator/inspector with the rank of Captain.  Captain Kee had no objective prior discipline with the Knox County Schools before he made complaints of illegalities.

26.     In responding to Paragraph 25, as stated verbatim in Paragraph 26 in the Complaint filed in the *Sanderson* lawsuit, Knox County and KCS averred in their Answer that, "Defendants are without knowledge or information sufficient to form a belief regarding the truthfulness of the allegations of Paragraph 25 of Plaintiffs' Complaint, and strict proof of the same is demanded." Accordingly, KCS has admitted that they did not review the personnel file of Captain Kee, and Knox County has admitted that neither the KCSO nor the Knox County Sheriff himself even considered

-6-

Captain Kee's background, employment history in law enforcement, or his extensive law enforcement training when they took the adverse actions alleged herein.

## (B) **Defendants' Structure & Policies**

27.    The Knox County Schools operates under the Defendant Board of Education.  The Superintendent of Schools operationally runs the KCS system; that person reports to the Board.  The Board is tasked with voting upon and enacting its own policies at publicly-noticed meetings.

28.    In prior years the Board effectively abdicated a large portion of its duties and responsibilities by delegating the power and ability to create and modify certain KCS policies to the Superintendent of Schools, being Jim McIntyre at the time, which allowed a new policy that facilitated the termination of Plaintiffs to be formulated.  In exercising his delegated ability to create and modify policies, including the ones set forth herein, McIntyre was acting with the actual and/or apparent authority of the Defendant Board of Education when he did so.

29.    Below the Superintendent of Schools are the heads of various departments or divisions of the KCS system. This case involves the security department/division (the "Security Department"; formerly labeled the "Security Division" in the *Sanderson* lawsuit).  The head of the Security Department currently is, and at all times relevant hereto was Chief Paidousis.

30.    McIntyre essentially delegated policy making and modification policy as to the Security Department, in part, to the Chief of Security, Paidousis, which allowed the policy that facilitated the termination of Plaintiffs to be formulated.  In exercising his delegated ability to create and modify policies, including the ones set forth herein, and in taking the actions complained of herein, Chief Paidousis was acting with the actual and/or apparent authority of the Superintendent of Schools and, thus, the Defendant Board of Education.

31.     The Security Department is generally hierarchal with Chief Paidousis at the top, after which there were senior staff supervisors with the "courtesy" rank of captain. At the time Captains Ryerkerk, Stewart, and Kee were fired there were a total of four (4) of these captains. The fourth, Greg Pinkston, also complained about Chief Paidousis, but he was promoted to a newly-created rank of Major when he refused to continue with his complaint.

32.     According to notes taken during an "investigation" of Chief Paidousis discussed *infra*, Debbie Dexter, a 20-year employee of Knox County Schools and Chief Paidousis' secretary, informed Knox County Schools that Chief Paidousis had his "favorites" and that the "theme" was "always the ones that agree with you." According to Defendants, however, the guise used to promote Pinkson to Major was that "he was forced to assume the workload of the [Captains], and was promoted commensurately with the responsibility which he assumed." Thus, 75% of the high-level supervisors were fired and one was promoted as a direct result of the complaints discussed herein.

### (C) Bond Cards

33.     Before the events giving rise to this lawsuit occurred, a person was required to have a Private Protective Services ("PPS") license provided for in, and acquired under the provisions of Tennessee law, in order to work as an officer in the Security Department. It was a long-standing KCS policy of accepting the PPS license for its security officers; a "Bond Card" was not always required.

34.     A "Bond Card" as used herein is a colloquial phrase for a credential that designates an individual as a Special Deputy of the KCSO. The reverse of the card states that the bearer is a "Knox County Security Officer bonded by the Knox County Sheriff's Office." The process is colloquially known as "being bonded" or "holding a bond card." The Bond Card gave the identified

-8-

bearer the same authority to carry a firearm as did the PPS card. The Bond Card is issued by the Knox County Sheriff himself, and it must be re-issued whenever a new Sheriff takes office.

35.     A Bond Card can be issued as unlimited or limited. A limited Bond Card only allowed the holder thereof to exercise law enforcement powers on the grounds of Knox County Schools property. An unlimited Bond Card allowed the holder thereof to exercise law enforcement powers anywhere in Knox County. Each of the Captains held an unlimited Bond Card.

36.     Tenn. Code Ann. § 8-8-212(a) provides that the "sheriff may appoint as many special deputies as the sheriff may think proper, on urgent occasions, or when required for particular purposes." Subsection (b) further authorizes a sheriff to "appoint as many private special deputies as qualify for appointment pursuant to § 38-8-118." Tenn. Code Ann. § 38-8-118 requires the individual to meet "all of the qualifications for a police officer set out in § 38-8-106" and further specifically requires them to have "received training or continuing training, from whatever source, that is equivalent to or superior to the training or continuing training required for a law enforcement officer under the standards established by the peace officer standards and training commission for law enforcement officers."

37.     As an indication of the lax standards for issuance of a Bond Card, and the total disregard for having a legitimate need for a person to hold a Bond Card as enumerated in Tenn. Code Ann. § 8-8-212, KCS human resources manager Becky Wuetrich was issued a Bond Card by the Knox County Sheriff. The problem is exacerbated by the fact that Wuetrich holds an *unlimited* Bond Card, whereby the Knox County Sheriff gave a civilian who has no legitimate need whatsoever for a Bond Card (let alone an unlimited Bond Card) and who does not meet the requirements of § 38-8-118, broad law enforcement powers throughout Knox County.

-9-

38.     With respect to grounds to revoke a Bond Card, the question was posed to Knox County in interrogatories propounded in the *Sanderson* lawsuit. The question was avoided and not answered by Knox County.  Plaintiffs therefore aver and allege that there is no list of "grounds" for revocation of a Bond Card, and that any Bond Card can be revoked for any arbitrary and capricious reason the Knox County Sheriff, including but not limited to the trading of personal favors.

39.     At the start of the complaints set forth herein, a Bond Card was not required in any job description as a requirement to be a Security Department officer.  Rather, an individual only needed to be "bondable; holding a PPS card sufficed.

40.     In mid-2016, Chief Paidousis unilaterally decided to not recognize the PPS even. Instead, he unilaterally started to require security officer's to obtain a Bond Card.  His decision was memorialized in an email he sent to all officers on or around January 26, 2016, *after* the Captains' Bond Cards were revoked.

41.     Knox County and KCS falsely denied the change referenced in the preceding paragraph in their Answer to the Complaint filed in the *Sanderson* lawsuit, affirmatively stating:

> Until 2016, School Security Officers (SSOs) employed by KCS were <u>also</u> permitted to obtain PPS cards, a practice which was at that time discontinued.   The requirement that SSOs and investigators be "bondable" or hold a "bond card" did not vary during the time that Chief Paidousis held the position.

(emphasis in original).   An article was published by the Knoxville News Sentinel on or about January 6, 2016, stated to the contrary:

> [Sheriff] Jones had issued unrestricted bond cards to the three captains in November 2014 at the request of Knox County Schools Chief of Security Gus Paidousis, according to Knox County Sheriff's Office spokeswoman Martha Dooley.

-10-

42.    Each of the Captains were employed by KCS Security Department long before November of 2014. Moreover, the article stated that "[p]revious Knox County Sheriff Tim Hutchison had revoked all school security bond cards at one time, prompting the school security unit to get security guard cards from the state department of commerce and insurance."

43.    Each of the Captains herein were thereafter fired by KCS for, allegedly, not having Bond Cards. In each case, the Knox County Sheriff "revoked" the Bond Card of the individuals, doing so in active concert and joint participation with Chief Paidousis *before* he changed the policy to require officers to have Bond Cards, thereby providing Chief Paidousis with the mechanism to terminate their employment by using his new Bond Card policy.

44.    There was no reasonable basis or need for Chief Paidousis to unilaterally start a new policy of refusing to recognize the PPS and, instead, mandate a Bond Card.  This is particularly true in that officers were chastised whenever they attempted to exercise law enforcement powers at a KCS school after they were bonded.  In several instances they were reprimanded and informed that they should have done nothing to investigate and/or arrest, and instead waited for either the Knoxville Police Department or the KCSO, as appropriate, to arrive at the school, even though the health, safety, and welfare of school employees and the children attending Knox County Schools could have been in imminent danger without prompt action.

45.    The Captains believe and aver that Chief Paidousis made the change to the policy so he could create a basis to terminate officers without recourse, as he had some ability to influence Bond Card revocations by the Knox County Sheriff, whereas he could not interfere with the PPS.

46.    Notwithstanding this change in policy, and upon information and belief, Knox County Schools can or will make "exceptions" to the Bond Card requirement for the right individual(s).

-11-

## (D) **Complaints and Reports of the Captains**

47.     In August 2013 during a training session, Chief Paidousis began discussing his views for the division.  He stated he was requiring all personnel to take a psychological test. Captains Ryerkerk, Kee and Stewart believed that it would be unlawful under the ADA to force existing employees to take a psychological test with the threat of employment termination.

48.     On October 15, 2013, Captains Ryerkerk, Kee and Stewart submitted the information regarding the ADA to senior administrators of the KCS, and later had a meeting with Superintendent McIntyre and his staff. After reviewing the complaint and the ADA materials provided, McIntyre decided that the test would be given notwithstanding the law.  Chief Paidousis then sent out a memo stating all KCS Security personnel would begin taking the psychological test on November 11, 2013.

49.     On October 15, 2013, Captains Ryerkerk, Kee and Stewart contacted Deputy Law Director Susan Crabtree to inform her of the pending mandate for employees to submit to unlawful psychological testing proposed by Chief Paidousis. On November 6, 2013, unit secretary Debbie Dexter sent a department wide e-mail informing all KCS Security employees that the psychological testing was cancelled and would not be rescheduled.  On or about November 7, 2013, Chief Paidousis made comments in a staff meeting, and expressed a violent threat, in that if he could, he would kill Deputy Law Director Susan Crabtree and would love to choke her to death.

50.     During the month of December 2013, after the termination of the psychological testing, Captains Ryerkerk, Kee and Stewart began to experience retaliation from Chief Paidousis in their daily interaction. Chief Paidousis continually referenced the psychological testing and that he was going to find a way to administer the test whether it was legal or not.  During staff meetings

-12-

he continued to say he could care less about the federal law and that he was going to get the psychological test completed one way or the other. When confronted with it being illegal, he stated that is why there are lawyers.

51.     Captain Stewart received a performance evaluation from Chief Paidousis in or around March of 2015.  The evaluation dropped 51% from the prior year's evaluation and in almost every category stated that he needed improvement. Comments were made that Captain Stewart must become a team player and share information with appropriate partners, and that he must also improve in meeting job related deadlines. The evaluation's conclusion was that he would be retained for employment with reservations.

52.     In March of 2015, Kee had his service weapon stolen from his locked Knox County Schools security vehicle which was parked at his house. The vehicle was broken into and several items were taken including his service weapon and badge. At the time of the break-in, there was no written policy stating weapons were not to be left in a vehicle. Chief Paidousis regularly created his own policy after an incident had occurred. A report was filed with the Blount County Sheriff Department and a crime scene tech responded to the scene.  In April 2015, Kee was suspended for three days without pay and also received a written reprimand.

53.     Sometime during May 2015, Captains Ryerkerk and Stewart met with Chief Paidousis in his office regarding another security officer who was placed on administrative leave, being Officer John Smelser.  Captain Stewart asked Chief Paidousis if Officer Smelser was going to return to work. Chief Paidousis replied "well it is hard to come back to work after being arrested, and you know he has a black wife, a black daughter and step-daughter. You know we just can't have that." Captain Kee the next day had a similar conversation with Chief Paidousis.

-13-

54. Later, in a routine meeting with Chief Paidousis about radios, he began talking about the current officer shortage. Captain Kee told him "if the charges are dropped against John Smelser, we could put him back to work." Chief Paidousis said Officer Smelser has a problem with his family. When Captain Kee asked for clarification, Chief Paidousis stated that Officer Smelser has a black wife and child, and "we just can' have that here."

55. On or about November 12, 2015, Chief Paidousis stated that the Captains had better worry about their jobs for making complaints about him.

56. In December 2015, Captain Stewart was placed on administrative leave for unprofessional conduct and breach of confidentiality. He returned to duty a week later and was given a conference of concern. Stewart provided a written response to the allegations in which they were denied in their entirety. In fact, there was no breach of confidentiality.

57. On December 14, 2015, Captains Stewart, Kee and Ryerkerk submitted a written complaint to Scott Bolton, the Knox County Schools' Director of Benefits and Human Relations, in which they reported violations of KCS policy and law. The subject matter of the complaint was the conduct and behavior of Chief Paidousis. The complaints included, but were not limited to:

A. That Chief Paidousis made racially charged offensive remarks to security personnel about a former officer who was terminated from his job;

B. That Chief Paidousis made racially charged comments about two other black officers who have been terminated;

C. That a female employee of the department has been subjected to sexual harassment and inappropriate comments from Chief Paidousis;

-14-

D. That Security Department employees have expressed fear of Chief Paidousis due to his frequent displays of anger, that he made threats of serious violence directed toward Deputy Law Direct Susan Crabtree, and that he expressed a desire to kill a former security officer who had embarrassed him;

E. That Chief Paidousis made comments that these Captains needed to be worried about their jobs, and that EEOC charges or their complaints about him will not protect them;

F. That a sergeant, being Sergeant Sanderson, discussed *infra*, was threatened by Chief Paidousis after he reported criminal acts committed by Security Department personnel; and,

G. That cameras were installed in the office areas specifically targeting employees who had spoken critically of Chief Paidousis, when adequate security cameras were already in place.

58. Bolton asked the Captains for the names of any witnesses that could support their complaints against Chief Paidousis. Names were provided; however, they subsequently stated to Captain Kee that Bolton had never contacted them.

59. Thereafter, on May 16, 2016, Bolton submitted his "Investigation Report" to McIntyre, with copies of Assistant Superintendent Bob Thomas, Chief HR Officer Kathy Sims, and Chief Operations Officer Russ Oaks.

60. Based on Bolton's hand-written notes from his interviews provided during discovery in the *Sanderson* lawsuit, Bolton wrote the report to protect Chief Paidousis and discredit the Plaintiffs, i.e. the complainants. Specifically, the report was skewed in that it adopted the statements of Chief Paidousis, discounted the reports of the complainants as being inconsistent or contradicted, used only the positive statements of interviewed witnesses, failed to interview all witnesses, and further added unnecessary, gratuitous commentary simply to place the complainants in a bad light.

-15-

61.     Bolton's report further failed to discuss major negative statements that were related about Chief Paidousis, nor did it call for any further investigations.  Specifically, Bolton's notes reveal the following from his interview with Debbie Dexter, referenced in ¶ 32, *supra*, none of which appear in his report:

      – That she was "concerned about [her] job"

      – That she was "very uncomfortable"

      – That "people are afraid about their jobs & are afraid to come to you"

      – When asked what made Ms. Dexter afraid, Bolton's notes state: "Guys said Chief said he could not trust her.  Chief walked by her desk & said there may be a new way to evaluate you.  You don't know what that means."

      – She reported to Bolton that, after they went to Russ Oaks, she thought he would get things "ironed out," but "it never happened."  She added that "Chief said he was angry and would beat them [the Captains] up."

      – Bolton asked Dexter "if you can do anything that would resolve [the] situation, what would it be?"  She responded, "I don't think I can."

62.     In a "Written Reprimand" dated December 16, 2015, a district human resources official directed Captain Kee to participate in harassment and sensitivity training provided by Scott Bolton, the KCS Director of Benefits and Employee Relations.  This was a reprimand for an incident that supposedly occurred six months prior.

63.     At that time, KCS human resource manager Becky Wuetrich informed Captain Kee was "savable" and that he needed to separate himself from Dan [Stewart] and Doug [Ryerkerk] in order for him to retain his job.  Insofar as she recommended in the past that he record conversations,

this one, as with others, was recorded. He was not "saved," however, as Captain Kee refused to remain silent.

64.     Captains Ryerkerk, Stewart, and Kee specifically requested that they "be granted whistle blower status under the Knox County Board of Education Policy GAP revised 5/13 defining such allegations." Notwithstanding that specific request and their duties under law, agents of KCS took no action whatsoever to protect them from the wrath of Chief Paidousis. Rather, they rallied to protect Chief Paidousis from the complaints.

65.     Moreover, in responding to the first sentence of the preceding paragraph, as stated verbatim in Paragraph 42 in the Complaint filed in the *Sanderson* lawsuit, Knox County and KCS averred in their Answer that, "Defendants are without knowledge or information sufficient to form a belief regarding the truthfulness of the allegations of the first sentence of Paragraph 42 of Plaintiffs' Complaint. Strict proof of same is hereby demanded." This admission by Knox County and KCS that they did not even bother to review the written complaint of the Captains from which the sentence was quoted is indicative that they do not investigate any complaints, including the complaints set forth in the *Sanderson* lawsuit, with any level of reasonableness before spending taxpayer money to cover, conceal, and hide the complaints.

66.     On or about January 4, 2016, Chief Paidousis took the personnel files of Captain Stewart, Kee, and Ryerkerk, and stated that he was going to see the Knox County Sheriff. Chief Paidousis does not routinely go to the KCSO to have matters "investigated" for bond cards to be revoked when other employees have received discipline, and certainly not for the level of "discipline" the Captains received.

-17-

67.     Knox County Sheriff J.J. Jones thereafter summarily revoked the Bond Cards of Captains Ryerkerk, Stewart, and Kee, without explanation.

68.     Captain Stewart thereafter called Knox County Sheriff J.J. Jones on to discuss the supposed reasons for his revoking of their Bond Cards. The Sheriff refused to talk to him.

69.     Captain Stewart then contacted Captain Cox, who was in the Sheriff's Department Office of Professional Standards. Captain Cox informed Captain Stewart that the Sheriff's Department had received an anonymous email stating that Captains Stewart, Kee, and Ryerkerk's files at KCS Security Department needed to be looked into because of supposed past complaints. Captain Stewart – **a 20-year Knox County Sheriff's Department veteran** – asked him why neither he, Captain Kee, nor **29-year Knoxville Police Department veteran** Captain Ryerkerk were interviewed by him.  Cox replied that he did not have to conduct any interviews.

70.     Plaintiff Ryerkerk, Stewart, and Kee aver that the KCSO did not conduct any kind of reasonable investigation of any allegations before summarily revoking their Bond Cards; there was no legitimate reason for the KCSO to revoke their Bond Cards; the KCSO does not routinely revoke Bond Cards under circumstances such as those presented in their case; that the Bond Cards were revoked at the urging of Chief Paidousis so he would have a basis to terminate their employment; and, that the KCSO acted in joint and concerted action, and civil conspiracy, to aid, abet, and assist Chief Paidousis to do so.

71.     On January 6, 2016, Captains Stewart, Kee and Ryerkerk were called to the KCS human resource office where they were placed on administrative leave because the Sheriff had revoked their Bond Cards.  This was a false basis because, up to that time, a PPS was sufficient and a Bond Card was not necessary.

-18-

72. Some **three (3) weeks later**, Chief Paidousis to changed the policy, sending out the

following memo on January 26, 2016:

> All—effective today, we will no longer find it necessary to purchase /
> renew / maintain pps cards. If you have a valid pps card, it will be valid
> until it expires, if your card is in process to be renewed it will be up to
> you to determine if you want to keep it active. A small number of cards
> have been sent over to AJ to be renewed and we are trying to stop those
> from being processed. If you have questions or concerns start with
> Captain Kirkendol!

73. Captain Ryerkerk's Bond Card was then revoked, but he was not given a reason.

74. Captain Stewart's Bond Card was then revoked, but he was not given a reason.

75. Captain Kee's Bond Card was then revoked, but he was not given a reason.

76. In an article published by the Knoxville News Sentinel on or about January 6, 2016,

Sheriff Jones was asked why he revoked the Bond Cards. According to the article, the KCSO

spokeswoman and Sheriff Jones, each acting as authorized agents of Knox County, stated:

> KCSO spokeswoman Dooley on Tuesday said the revocations ordered
> by Jones are not retaliation against the captains for the complaint
> against Paidousis. Instead, Dooley said, the sheriff was looking out for
> the residents of Knox County.
>
> "He saw this was a liability for Knox County and that's his job, to limit
> the liability to the county," Dooley said.
>
> Dooley said Jones learned on Dec. 31 that the captains had been
> disciplined for various reasons. He ordered an investigator with the
> agency's Office of Professional Standards to review the captains'
> personnel files to determine why they had been disciplined.
>
> "He's got no other choice but to revoke their bonds for now," she said.

77. Captains Stewart, Kee, and Ryerkerk remained on administrative leave with pay until

June 14, 2016, apparently so an "investigation" could be completed.

78.     Unlike the Captains who were placed on administrative leave while "investigations" of their alleged wrong-doing were ostensibly being conducted, Knox County and KCS have admitted that Chief Paidousis has NEVER been placed on administrative leave for ANY of the myriad of serious complaints that had been made against him, any of the allegations in any EEOC charges, or any of the allegations in the suite of lawsuits he caused the County to defend.

79.     On June 14, 2016, Captains Ryerkerk, Stewart, and Kee were each explicitly terminated in writing AND given the option to take another position in another area of the school system, retire, or have the terminations remain in effect.  The "offers" were not made in good faith.

### (E)  Other Acts of Retaliation by Chief Paidousis and Knox County

80.     In addition to all of the foregoing, yet other reports of illegalities or unlawful conduct were made, none of which was corrected or even addressed by KCS, *to-wit*:

### (i)  Sergeant Davey Sanderson

81.     Davey Sanderson started employment with the Knox County Schools Security Department in April of 2005.  He was promoted to Sergeant in 2013.  Sergeant Sanderson had no prior discipline before he made complaints of illegalities and aided other employees who complained of discrimination.

82.     On November 3, 2015, a fellow sergeant related illegal moonshine activity to Sergeant Davey Sanderson, an officer in the Security Department.  The following day, Sergeant Sanderson reported to Captain Stewart illegal moonshine being brought and sold at the KCSO firing range off Maloneyville Road during school hours (and at taxpayer expense). He specifically identified four (4) KCS Security officers who were involved, including another captain (not a plaintiff herein) in the KCS Security Department.

-20-

83.     Captain Stewart thereafter reported the incident to Chief Paidousis, investigated the matter, and supported Sergeant Sanderson.  Chief Paidousis then contacted Sergeant Sanderson and was asked to relate all the details concerning the exchange of the moonshine.

84.     On or about the second week of January 2016, KCS human resource managers Becky Wuetrich and Scott Bolton interviewed Sergeant Sanderson about the illegal moonshine complaint. Sergeant Sanderson then informed them of the illegal selling of moonshine.

85.     Thereafter, Sergeant Sanderson was informed he would be moved to another school. Shortly thereafter, the West High School principal and an assistant principal mentioned to him that they heard he was being transferred to another school.

86.     West High School employee Teresa Countess, with whom KCS Security Department Major Pinkson had a form of relationship, sent an email about Sergeant Sanderson's transfer to personnel in the Superintendent's office, as he learned when Chief Paidousis inquired whether he knew anything about the email. Afer discussing the matter with Chief Paidousis, Sergeant Sanderson was given a written reprimand regarding "confidentiality" ostensibly dealing with what was apparently supposed to be a top-secret transfer to another school.

87.     On December 19, 2016, Sergeant Sanderson handed a completed EEOC complaint form to Jennifer Hemmelgarn with the KCS human resources department.  On January 10, 2017, he received a phone call from her asking if he wanted his EEOC complaint to be processed, to which he replied that he did.  She later stated that the complaint would be sent to the two supervisors that he made the complaint on, Chief Paidousis and his deputy, newly-promoted Major Pinkston.

88.     Sergeant Sanderson was thereafter ordered to be at a meeting on January 26, 2017. He was told at the meeting that his Bond Card had been revoked by the Defendant KCSO and that

-21-

he was being placed on administrative leave with pay. When he inquired why his Bond Card had been revoked, they KCS managers denied any knowledge.

89. Sergeant Sanderson later received the "Summary of Facts and Recommendation" from the KCSO, a true and correct copy of which is attached as Exhibit G. As an indication of the extreme arrogance and reckless indifference to which the Captains have been subjected by those entrusted with control of county law enforcement operations, that same document first rejected Sergeant Sanderson's complaints of illegalities and then **immediately** went on to retaliate against him for making it by recommending that his Bond Card be revoked by the Sheriff.

90. On page 1 of the "Summary," KCSO Captain Tom Cox superficially dismissed Sergeant Sanderson's complaints of illegalities and against Chief Paidousis.

91. On page 2 of the "Summary," Cox went on to retaliate against Sergeant Sanderson, stating that he violated a Knox County General Order by making the complaint even though Sergeant Sanderson was under a legal obligation to report the illegal activities that occurred at the KCSO firing range, and even though it amounted to a waste of education taxpayer money that had to be reported. Cox stated that Sergeant Sanderson's comments "have no factual basis" and were "made with reckless disregard for the truth" when, in fact, they were true. Cox gratuitously ended his "Summary" with the statement, "It is not possible to explain or to understand what would motivate a rational human being to offer such patent falsehoods, especially when one considers the predictable consequence." On February 9, 2017, Sheriff Jones signed his initials "JJ" at the end of the document with the note that he concurred with Cox that Sergeant Sanderson's Bond Card should be revoked.

-22-

92.     In contrast to Cox' "Summary," Bolton, in his May 16, 2016, "investigation report" provided to McIntyre, acknowledged that there was, indeed, a "moonshine incident." Bolton further states that Chief Paidousis "determined that the officer gave it [the moonshine] to the other sergeant."

93.     The Bolton report was based on notes provided by Knox County during discovery in the *Sanderson* lawsuit.  Each of the individuals interviewed were known to Cox, yet Cox made a false statement in an official document, Exhibit G, in order to have Sergeant Sanderson's Bond Card revoked in retaliation for his making a complaint against the Sheriff's Department.

94.     One factual statement made by Sergeant Sanderson in his complaint that Cox deemed to "have no factual basis" and was "made with reckless disregard for the truth" was that " to my knowledge no one from Knox Co. School Security was given a written reprimand."  In reality as indicated by sworn interrogatory answers provided by Knox County in the *Sanderson* lawsuit, the fact was almost true. The admission revealed that, "At the conclusion of the investigation [conducted by Chief Paidousis], Kenny Boles was issued corrective action in the form of a *verbal* warning.  No other employees were disciplined as a result of the investigation" (emphasis added).

95.     There is no indication that the illegal moonshine running has been reported to the Knox County District Attorney General, the U.S. Attorneys' office, the Internal Revenue Service, or the Tennessee Department of Revenue relative to the illegal making and selling of alcohol.  There is also no indication whether Cox was placed on administrative leave and/or investigated for making a maliciously false statement of material fact in an official document by denying that the moonshine incident occurred, and by characterizing Sergeant Sanderson's report as having "no factual basis" and being "made with reckless disregard for the truth."

-23-

96.    A reasonable person could conclude that Security Department officers and Knox County Sheriff Deputies who illegally engage in a moonshine operation at the Knox County Sheriff's firing range drank while discharging weapons or, worse, did so drunk.  Based on the interrogatory answers signed under oath by Dr. Clifford Davis, Jr., Chief of Staff for KCS, the Captains aver and allege that a cover up was engaged in by the Knox County government as established by KCSO Captain Cox' false statements knowingly made in an official document to support a recommendation that the whistleblower have his Bond Card revoked.

97.    Unlike Sergeant Sanderson, the moonshine runner, then-officer Boles, did not have his Bond Card revoked.  In contrast to the statements published by the Knoxville News Sentinel on or about January 6, 2016, about the Captains, Sheriff Jones did not order the revocation of the Bond Card issued to Boles because, apparently, he saw no basis for "looking out for the residents of Knox County," and he saw no "liability for Knox County" even though "that's his job, to limit the liability to the county" with respect to running moonshine at the KCSO firing range.

98.    As a result of his Bond Card being revoked, Sergeant Sanderson was explicitly fired in writing by KCS on March 29, 2017.  In his termination letter, Sanderson was given the choice to, essentially, be re-employed by taking a position in a different area unrelated to his skills at a greatly reduced rate of pay.  Sergeant Sanderson had no choice but to take the position.

99.    KCS then retaliated against Sergeant Sanderson by placing him in a position in a classroom in which he was to provide care for physically disabled children.  An incident arose over changing the diapers of girls.  Sergeant Sanderson stated to Wuetrich that he felt uncomfortable doing it alone, as the teachers did so and he was told to do so.  He reported his concern to her, yet

-24-

he was disciplined and, then, fired on March 29, 2017, because he would not sign a training form on changing diapers as he felt he was not trained. Knox County and KCS admitted in their Answer to the Complaint filed in the *Sanderson* lawsuit that "Sanderson was terminated for not signing a required training form."

100. The form that Sergeant Sanderson was fired for not signing states that the requirement is for two (2) adults to do the changing. While Sergeant Sanderson was supposedly fired for the ostensible grave transgression that seriously impacted the good order of the Knox County Schools, Wuetrich did not even ask Sergeant Sanderson to name the teachers who he just reported were doing the changing of diapers alone – a serious violation of school policy. That allegation was denied by Knox County and KCS denied the averment that such conduct would be "a serious violation of school policy" in their Answer to the Complaint filed in the *Sanderson* lawsuit, and denied that Wuetrich did not ask that Sergeant Sanderson identify the teachers, yet there has been no public statements that any such teachers were supposedly investigated or reprimanded despite the serious risk of harm to disabled female students by certain teachers.

101. As a result of the foregoing, Officer Sanderson filed suit, the case being *Davey Sanderson et. al. v. Knox County, Tennessee et. al.*, Knox County Chancery Court case 193924-3, being the *Sanderson* lawsuit. That case remains pending is a second lawsuit being borne by the Knox County taxpayers due to the refusal to act against, and actions in protecting Chief Paidousis.

**(ii)** **Officer Larry Grant**

102. Larry Grant is a U.S. Army veteran, having served from 1970-1972 with time in Vietnam. He retired as a Sergeant from the Knoxville Police Department in December 2008 after 33 years of service, and started with the Knox County Schools Security Department in August 2012.

103.    Officer Grant repeatedly tried to be promoted to Deputy Chief and as a Sergeant.   He also applied for the Professional Standards position and an Investigator position.  Every attempt he made was denied. He complained that Chief Paidousis engaged in sex discrimination by favoring a female over him. Officer Grant applied for the Deputy Chief position and, even though he was by far the most qualified person for the job, Chief Paidousis insisted on giving it to a far less qualified female.  Officer Grant also questioned why a football coach was transporting students in his personal vehicle in relation to the inappropriate personal actions of the football coach's wife.  Officer Grant also supported Captains Kee, Ryerkerk, and Stewart when they were fired by Chief Paidousis in retaliation for, in part, their complaints of his race discrimination.

104.    After his complaints, Chief Paidousis further made Officer Grant's job more difficult. In August of 2015, he was re-assigned from South Doyle High School to Central High School in Fountain City, knowing it would be a hardship on Officer Grant since he lived in Maryville and this new assignment would more than double his travel time and distance.  He was also repeatedly investigated for matters that did not occur.

105.    Officer Grant then filed a Charge of Discrimination with the EEOC.   In it, he complained that Chief Paidousis engaged in sex discrimination.   After he filed his Charge, he received negative performance reviews that were objectively unfounded, and he was never promoted.

106.    Based on the foregoing, Officer Grant filed another Charge of Discrimination on or about March 30, 2017 alleging retaliation. Since the filing of his second Charge, Officer Grant has again received negative performance reviews by Chief Paidousis, through newly-promoted Major Pinkston, that are objectively unfounded.  He is now told that he being retained "with reservations."

-26-

107.    Officer Grant has since received his Notice of Right to Sue.  He will soon be filing suit in this U.S. District Court shortly, making it a third lawsuit borne by the Knox County taxpayers due to the refusal to act against, and actions in protecting Chief Paidousis.

**(F)  Other Unlawful Actions of Chief Paidousis**

108.    In addition to all of the foregoing, Chief Paidousis engaged in yet further unlawful conduct, none of which was corrected or even addressed by KCS, *to-wit*:

**(i)  Officer John Smelser**

109.    Officer John Smelser is in an interracial marriage; he is white and his wife is black. He was the object of the racist comments made by Chief Paidousis alleged *supra*.

110.    On or about April 7, 2015, Officer Smelser was arrested in Knox County for the misdemeanor of domestic assault, which did not occur when he was on the job and which did not involve his wife. After being arrested he was placed on administrative leave.

111.    On May 18, 2015, all charges against Officer Smelser were voluntarily dismissed by the County in Knox County General Sessions Court, i.e. it effectively never occurred.

112.    After the charges were dismissed, Officer Smelser attempted to return to work.  Chief Paidousis refused to speak to him.  Thereafter, on or about May 19, 2015, Officer Smelser received a letter stating that his "services were no longer needed" and his employment was terminated "effective immediately."

113.    In truth and fact, based on the comments made by Chief Paidousis before this event occurred, Officer Smelser was fired by Chief Paidousis because of his overt contempt for interracial marriages.

-27-

114.    Officer Smelser filed suit on April 7, 2016, being case *John Smelser v. Knox County Board of Education et. al.*, Knox County Circuit Court case 2-170-16, making it a fourth lawsuit borne by the Knox County taxpayers due to the refusal to act against, and actions in protecting Chief Paidousis.

115.    As to the issue of Bond Cards, the sworn testimony of Chief Paidousis given in the *Smelser* lawsuit indicates the extent of the arbitrary and capricious nature of how Sheriff Jones' handles appointing special deputies:

> QUESTION:  Well, did you ever tell anybody you weren't going to waste a favor on [Smelser] getting his bond card back?
>
> CHIEF PAIDOUSIS: I was not going to ask the sheriff to return his bond card.
>
> QUESTION: Okay, Let's delve into that a little bit.  When did you say that and who did you say that to?
>
> CHIEF PAIDOUSIS: I would have said that in an HR meeting to Dr. McIntyre that I did not – I would have to ask the sheriff to return his bond card, and I was not prepared to do that.
>
> QUESTION: Why not?
>
> CHIEF PAIDOUSIS: I just didn't feel like I should.

**(ii)  Officer Sam Lasley**

116.    Edwin S. Lasley was also an officer with the KCS Security Department, having been employed there for over seven (7) years.

117.    Officer Lasley had a medical condition that required an accommodation, specifically, he had a bad knee that limited him in walking, standing, and climbing stairs.

118.    Officer Lasley requested an accommodation from Chief Paidousis, such as working at dispatch.  He even offered to work part-time or as-needed.  Chief Paidousis refused.

-28-

119. On or about May 6, 2015, Chief Paidousis informed Officer Lasley that his employment was being terminated at the end of the 2014-15 school year due to "limited mobility."

120. As a result of the foregoing, Officer Lasley filed suit on May 4, 2016, in the pending case *Edwin S. Lasley v. Knox County, Tennessee et. al.*, Knox County Circuit Court case 2-214-16, making it a fifth lawsuit borne by the Knox County taxpayers due to the refusal to act against, and actions in protecting Chief Paidousis.

**(iii) <u>Officer James Kitts</u>**

121. James Kitts was also an officer in the KCS Security Department. In a case strikingly similar to that of Officer Lasley, Officer Kitts required an accommodation. His was due to an injury. Chief Paidousis also refused to provide him with an accommodation in violation of law.

122. On June 30, 2017, counsel for Officer Kitts sent a letter to Superintendent Bob Thomas that set forth the facts:

> Officer Kitts informs us that he recently suffered an injury covered by Workers' Compensation. He went on leave and had surgery. There was no issue with the Workers' Comp process. The problem arose when he was ready, willing, and able to return to work. He was released by his doctor for light duty work. He has been consistently denied such work by Chief Paidousis. What is striking is that it is a custom, pattern and practice for the security department to provide light-duty work for such employees. For example, Officer Kitts has extensive experience with dispatch, yet his request to perform that job when the full-time dispatcher was out on medical leave was denied. In another instance, his request to work at the KCS Security Academy was denied by Chief Paidousis. We can see no reasonable, justifiable reason for Chief Paidousis to deny Officer Kitts that work when he has extensive experience working at the academy. In our considered professional opinion, this is a classic case of Workers' Comp retaliation. We would respectfully suggest that the school does not need yet another lawsuit due to Chief Paidousis. Accordingly, we are writing to you on behalf of Officer Kitts with a request that you intercede on his behalf to see that he is immediately placed back to work in a light-duty status without any loss of his paid leave that otherwise would not have occurred but for the unlawful actions of Chief Paidousis.

There is also a more problematic issue that we regret having to bring to your attention. You are aware of the complaints made by Officer Larry Grant that compelled him to file a Charge of Discrimination against Knox County Schools based on sex discrimination. The basis of his charge is that Chief Paidousis routinely passed him over for promotion to Sergeant despite his decades of experience in law enforcement in favor of, literally, unqualified women. Officer Kitts informs us that he, too, an employee with decades of law enforcement experience, has been repeatedly denied a promotion to Sergeant by Chief Paidousis. The situation is getting radically out of hand.

Please feel free let me know if we can provide any other information in an effort to resolve this deteriorating situation involving Chief Paidousis.

123. Superintendent Thomas simply ignored the matter entirely – the issue of Officer Kitts, the issue of Officer Grant, and the actions of Chief Paidousis. Neither he nor the Knox County Law Department responded.

### G. Politics Over School Safety

124. Kevin Tarbell was also an officer in the KCS Security Department, having worked there since November of 2011.

125. Chief Paidousis commented to the Captains that Officer Tarbell did not fit his profile of a KCS security officer, and that he needed to find something to do with him. Based on comments received, Officer Tarbell believes it was a reference to his weight.

126. In turn, Major Pinkston started to make working conditions for Officer Tarbell unbearable. He would often make up problems such as "civility" – as he did with others – whereas both Chief Paidousis and Major Pinkston were known by Knox County Schools for screaming and berating people. Major Pinkson, with the concurrence (or at the instruction) of Chief Paidousis would also constantly move Officer Tarbell from one school to another. Throughout this time, Major Pinkston and Chief Paidousis constantly gave him negative reviews.

-30-

127.    Officer Tarbell is of Hispanic heritage.  During an evaluation of his performance, Major Pinkston made a direct adverse comment as to his national origin.

128.    During this time, Officer Tarbell complained about sexual harassment by a principal. Major Pinkston and Chief Paidousis did nothing.  Instead, Major Pinkston told him he was "making waves" and that he "should leave it alone" or it would "cause" Officer Tarbell "trouble."

129.    At one time, Officer Tarbell saved the life of an 8th grade student who was choking and needed to be revived.  Major Pinkston chastised him for not waiting for the school nurse, and that it was not Officer Tarbell's decision to make.  Officer Tarbell was nevertheless awarded the life saving medal, the first in his department to receive it.

130.    At another time, Officer Tarbell was informed by a Knox County officer that his ex-son-in-law was recently released from prison and was making threats to come to the school and "shoot it up."  Officer Tarbell verbally reported the threat to the principal.  He was eventually told that the school secretary had already been informed. Officer Tarbell subsequently confirmed how his conversation went with the principal by sending her an email, on which he copied his superiors. In his email, Officer Tarbell directly complained about conduct that impacted the health, safety, and welfare of the children of Knox County Schools:

> This is not the first time there has been issues were [sic] the officers have been kept out of the loop by office staff, and in this case, we have a potential for [a] real issue that I and I alone will need to deal with ***
> And this issue could jeopardize the school's safety and mine.  I must say the harassment from them needs to stop ...

131.    Major Pinkston told Officer Tarbell the following day that he was being moved to another school because he should not have sent the email.  Officer Tarbell told him that the safety and security of the kids and staff was his job and he had to make his supervisors aware of the

situation. Major Pinkston sent Officer Tarbell home for the day and told Officer Tarbell to withdraw the email because the principal was very angry and she wanted Officer Tarbell removed.

132. The conclusion of the foregoing is that a principal in KCS can over-ride the discretion of a school security officer if she elects to not give full credence to the harm posed from an active threat of a shooting, that an officer can be reprimanded and transferred for complaining, and that the Security Department management from Chief Paidousis through Major Pinkson will support the principal over the safety of the children of KCS.

133. At the end of his employment, Chief Paidousis informed the principal of the school to which Officer Tarbell was assigned that he resigned. That, in fact, was not true. Chief Paidousis then had Officer Tarbell come to the security office, at which time his keys, uniform, firearm, and Bond Card were taken. He was told by Major Pinkson that Chief Paidousis thought it best to suspend and investigate him due to Officer Tarbell's alleged "mental deficiencies."

134. Officer Tarbell was subsequently returned to work at a different school – and then he was transferred to another school yet again. The principal complained about the move, but the transfer was effectuated anyway. Days later, Wuetrich called him to the school security office and suspended him for several alleged infractions that supposedly occurred within the previous two (2) days. They again took his keys, uniform, firearm, and Bond Card. Weeks later he received a termination letter and human resources would not talk to him. After doing his own investigation into the allegations, Officer Tarbell discovered there had been no genuine investigation.

135. As a result of the foregoing, Officer Tarbell will be filing suit shortly, making it a SIXTH lawsuit borne by the Knox County taxpayers due to the refusal to act against, and actions in protecting Chief Paidousis, now acting through his second-in-command, Major Pinkston.

-32-

## (G) Protecting and Refusing to Investigate Chief Paidousis

136.    Despite all of the complaints, EEOC charges, and lawsuits directly resulting from the actions of Chief Paidousis, Knox County and KCS admitted in responses to interrogatories served in the *Sanderson* lawsuit that he has never "been given a reprimand, disciplinary warning or other disciplinary action during his employment with Knox County Schools."

137.    It was further admitted by Knox County and KCS that Chief Paidousis was never placed on leave at any time material to the *Sanderson* lawsuit, and that, "[t]he decision regarding whether an employee is placed on leave pending an investigation into his or her conduct is made on a case by case basis by the executive leadership of Knox County Schools."

138.    Relative to the innocuous infractions (if any) of the Captains, it is objectively unreasonable that Chief Paidousis has never been placed on administrative leave pending an investigation by any of the three (3) Superintendents who served during the events relative to this Complaint given the voluminous number of complaints, EEOC charges, and lawsuits that directly resulted from his conduct.

139.    It is further objectively unreasonable that no bona fide, neutral investigation has ever been conducted, and no government official known to Plaintiffs have taken any action to stop or question the misconduct except as set forth herein, given the voluminous number of complaints, EEOC charges, and lawsuits that directly resulted from his conduct. This includes, but is not limited to, any public demand by the Knox County Mayor or the KCS Board of Education that at least one (1) of the many matters be neutrally investigated, unlike the skewed "investigation" conducted by Scott Bolton on a mere portion of the complaints and allegations raised against Chief Paidousis.

-33-

140.   As evidence of the lack of concern exhibited by KCS regarding Chief Paidousis, reference is made to the following document request served on Knox County ad KCS in the *Sanderson* lawsuit: ". . . provide for inspection and copying all Documents which was [sic] created, compiled, written or obtained in relation to each reason to not place Gus Paidousis on administrative leave and/or to conduct any investigation."  Knox County and KCS responded, "There are no known documents responsive to this request."

141.   Rather than act to correct the matters – or any of them – KCS made a conscious decision to keep Chief Paidousis after he announced his resignation from KCS earlier in the year. His resignation was to be effective on July 1, 2018. Shortly after making his announcement, he changed his mind for some reason unknown at the present and asked to "withdraw" his resignation. Despite the voluminous number of complaints made against him, and despite being the person who caused the filing of numerous EEOC complaints an lawsuits, Chief Paidousis was secretly permitted to withdraw his resignation and remains employed with an unrestricted bond card.

142.   Chief Paidousis himself saw no need to worry about the *Sanderson* lawsuit as though he knew that it would not affect his career, as evidenced in the sworn testimony he gave in the *Smelser* lawsuit.  When asked if he read the complaint in the *Sanderson* lawsuit, he testified that it involves "those three, and it may involve David Sanderson, . . ."  He also testified, "I cannot under oath tell you that I have read it in detail."

### (H)  Failure to Act After Extensive Reporting

143.   The Captains extensively made their complaints known throughout the Knox County and KCS hierarchy.  From all appearances, nothing was effectively done by any individual, *to-wit*:

-34-

**Tim Burchett**

144. Tim Burchett was the mayor of Knox County at all times material hereto. His term ended on August 31, 2018.

145. Captains Stewart and Ryerkerk met with Burchett in his office in June or July of 2016. They detailed their complaints in a lengthy meeting, at which Knox County staff were present. At the end of the meeting, Burchett simply stated that they would look into it.

146. Burchett was thereafter served with the *Sanderson* complaint in his capacity of Mayor of Knox County. That complaint also detailed the moonshine incident and retaliation.

147. Despite his knowledge of the complaints, the lawsuits, the slew of EEOC complaints, and the moonshine incident, Burchett effectively *did nothing*.

**Jim McIntyre**

148. The Superintendent of KCS at the beginning of these events was Jim McIntyre. He left in June 2016.

149. As noted *supra*, the Captains informed him of the complaints involving Chief Paidousis.

150. McIntyre further knew of the allegations against Chief Paidousis in the *Smelser* lawsuit, as it was filed and served during his tenure.

151. McIntyre further knew of the allegations against Chief Paidousis in the *Lasley* lawsuit, as it was filed and served during his tenure.

152. Despite his knowledge of the complaints and the lawsuits, McIntyre effectively *did nothing*; instead he fired the Captains on his last day on the job.

-35-

## Buzz Thomas

153. The next Superintendent of KCS was Buzz Thomas, who acted as interim superintendent from June 2016 through April 2017.

154. The complaints and retaliation involving Chief Paidousis were brought to his attention. He was also made aware through the *Sanderson* lawsuit as it was filed during his tenure.

155. Thomas also knew of the *Smelser* and *Lasley* lawsuits involving Chief Paidousis, as they were actively being litigated during his tenure.

156. Thomas effectively *did nothing*; instead he fired Sergeant Sanderson.

## Bobby Thomas

157. The next Superintendent of KCS was Bobby Thomas, who started in April 2017 and is currently in the position.

158. The complaints and retaliation involving Chief Paidousis were brought to Thomas' attention. Specifically, each of the Captains met with him when he was Assistant Superintendent and, at that time, Chief Paidousis' immediate supervisor. Then-deputy chief of security Rodney Beverly also met with Thomas at that time out of concern for the complaints. Thomas' response was that he had no power to make decisions.

159. Captain Kee, Officer Grant, and Beverly also met with Bob Thomas shortly before he was installed as Superintendent. Again he was informed of the complaints and retaliation involving Chief Paidousis. He stated he would "look into" the matter, but he never reverted to the Captains, Officer Grant, or Mr. Beverly.

160. Thomas was further aware of the complaints involving Chief Paidousis through the *Sanderson* lawsuit, as it was filed during his tenure.

-36-

161. Thomas also knew of the *Smelser* and *Lasley* lawsuits involving Chief Paidousis, as they were actively being litigated during his tenure.

162. Thomas was further aware of the EEOC charges regarding Chief Paidousis that were filed during his tenure.

163. Thomas effectively *did nothing*; instead he allowed Chief Paidousis to withdraw his resignation so he could return to KCS as chief of the Security Department.

**Russ Oaks**

164. Russ Oaks was at one time Chief of Staff at KCS, and later became the Chief Operations Officer of KCS which is his current position. Oaks became Chief Paidousis' immediate supervisor after Bob Thomas.

165. The Captains met with Oaks to detail their complaints on or about August 10, 2015. At the conclusion of the meeting, Oaks stated that Chief Paidousis was still going to be their supervisor, adding "What do you want me to do about it?"

166. Upon information and belief, Oaks never investigated their complaints. Instead, he turned it over to Chief Paidousis for some kind of self-investigation.

167. Oaks effectively *did nothing*; instead he did not object when Bobby Thomas allowed Chief Paidousis to withdraw his resignation so he could return to KCS as chief of the Security Department.

**The Board of Education**

168. The members of the Board of Education when the Captains first made their complaints were: Patti Bounds, Karen Carson, Gloria Deathridge, Lynne Fugate, Doug Harris, Terry Hill, Michael McMillan, Amber Rountree, and Tracie Sanger.

-37-

169. On December 14, 2015, the Captains sent an email to each of the Board members, and included the complete text of their complaint that they tendered to Scott Bolton. Each of the Board members were explicitly informed in the email as follows:

Subject: Violations of School Board Policy and Federal Law

The three employees of the Knox County School System's Security Department listed above wish to file a written complaint with the human resource department. The subject matter of the complaint is the conduct and behavior of Security Chief Gus Paidousis. The conduct described below is alleged to be a violation of school board policy and federal law. The items listed are not inclusive of all the egregious conduct Chief Paidousis has exhibited but should serve to be a starting point for a Human Resource Inquiry into the allegations.

Chief Paidousis has made racially charged offensive remarks to security personnel about a former officer who was terminated from his job. He stated that the officer had a black wife and family and we couldn't have "that" in the security department. An EEOC complaint is being pursued concerning that subject. Chief Paidousis has made racially charged comments about two other black officers who have been terminated.

A female employee of the department has been subjected to sexual harassment and inappropriate comments from Chief Paidousis that have made her very uncomfortable and fearful of him.

Employees of the security department, specifically the security office employees, have expressed fear of Chief Paidousis due to his frequent displays of anger. One female dispatcher stated that she fears that he may "go postal" in the office environment.

Chief Paidousis has used profanity in the presence of employees. During in-service training day this school year, he cursed the entire uniform body and berated them and others in a ninety minute monologue which upset and concerned several of the officers present.

He has in the past made threats of violence directed toward Deputy Law Director Susan Crabtree. He also verbally expressed a desire to kill a former security officer who had embarrassed him.

-38-

After a meeting was held with the Chief Operating Officer Russ Oaks to discuss some of the issues regarding Chief Paidousis, nothing was done to resolve the issues, and retaliation from Chief Paidousis has and is still occurring towards the office staff members that attended the meeting.

He has made comments that the investigators need to be worried about their jobs, and that the EEOC complaints or our complaints about him will not protect them.

A Sergeant in the department [Sanderson] was threatened by Chief Paidousis after he reported criminal acts committed by security department personnel.

Cameras were installed in the office areas specifically targeting employees who had spoken critically of Chief Paidousis. Security cameras were already in place and the installation of additional cameras was felt to be a matter of intimidation and unnecessary because the building already had adequate security cameras in place.

Security personnel who work daily with Chief Paidousis are fearful of loss of employment due to his vindictive retaliatory nature, and history of terminating employees during his tenure as security chief.

The above listed senior staff Captains request an investigation into these allegations as soon as possible by the Knox County Schools Human Resource Department. Due to the fact that some of the allegations rise to the level of a criminal offense, the employees named in this document request to be granted whistle blower status under the Knox County Board of Education Policy GAP revised 5/13 defining such allegations. The board policy is clear concerning such matters.

In addition, Chief Paidousis has by his conduct and actions violated the Knox County School Board policy titled Civility Code BK revised 4/11, and Harassment of Employees GAO revised 2/12

The above employees of the security department request that the board's policies be followed and enforced. Chief Paidousis should be held accountable as would any other employee in the school system regardless of rank or stature.

-39-

170. One or more of the Captains further had discussions with several Board members about the complaints, including Patty Bownds and Mike McMillan.

171. Patti Bounds effectively *did nothing*.

172. Karen Carson effectively *did nothing*.

173. Gloria Deathridge effectively *did nothing*.

174. Lynne Fugate effectively *did nothing*.

175. Doug Harris effectively *did nothing*.

176. Michael McMillan effectively *did nothing*.

177. Amber Rountree effectively *did nothing*.

178. Tracie Sanger effectively *did nothing*.

179. Of all of the Board of Education members, **only one stood up and took any action of any significance to investigate and resolve the issues** – Terry Hill. By way of example, she questioned Chief Paidousis' email of January 26, 2016, changing the PPS / Bond Card policy. She wrote to McIntyre that same day:

> Hi Jim,
>
> I am assuming you are aware of the email copied below. I have a question:
>
> Since pps cards are no longer paid by KCS does this mean the only option for a security officer to work for KCS is a restricted (or unrestricted) bond card from the Sheriffs office?
>
> If answer is yes then it would appear KCS has surrendered hire/fire authority to another entity. (Which has already been demonstrated...do we want Sheriff or KPD making those calls?)
> If answer is no then how can our officers function with weapons.
>
> **Or is this another way to be sure our three captains cannot keep their jobs?**

-40-

> Or a "convenient" time for security to finally decide they need to
> "save some money"??
>
> Thanks,
> Terry

(emphasis added).

180.   The current, new members on the Board of Education are Susan Horn, Tony Norman, and Jennifer Owen, having replaced three other members. Each of the new board members have knowledge of the facts set forth in the *Sanderson*, *Smelser*, and *Lasley* lawsuits, or, at the least, had a duty to familiarize themselves with the facts of those lawsuits given their public nature.

181.   Despite the complaints set forth in the lawsuits, Susan Horn has effectively *done nothing*.

182.   Despite the complaints set forth in the lawsuits, Tony Norman has effectively has *done nothing*.

183.   Despite the complaints set forth in the lawsuits, Jennifer Owen has effectively *done nothing*.

184.   The current Board of Education, instead of taking action to stop the extreme risk objectively posed by Chief Paidousis given the plethora of complaints, EEOC charges, and lawsuits, silently permitted Superintendent Bobby Thomas to allow Chief Paidousis to withdraw his resignation so he could retain his position as KCS chief of the security.

### The Knox County Law Director's Office

185.   Each of the Captains also met individually with Assistant County Law Director Gary Dupler on December 3, 2015, to bring their complaints to the law director's office.

-41-

186.  During the meeting with Captain Kee, Dupler acknowledged the issues with Chief Paidousis.  He specifically stated, quote, "My job is to keep the school system legal and from what I am seeing here, it is not illegal as far as criminal but it's outside the law."

187.  Despite this observation by Assistant County Law Director Dupler, no person in the hierarchy of the Knox County government or the KCS system has done anything to check the conduct of Chief Paidousis that is "outside the law."  Rather, they welcomed him to withdraw his resignation and remain as KCS chief of security.

**"J.J." Jones**

188.  The Sheriff at all times material hereto was "J.J." Jones. His term ended on August 31, 2018.

189.  Jones was aware that the Captains and Sanderson wished to speak to him regarding the revocation of their bond cards, and he refused to meet with any of them.

190.  Jones knew, or reasonably should have known with any modicum of an investigation, that Captain Cox of his department lied in an official document.

191.  Jones was made aware of the complaints by virtue of being served with the *Sanderson* complaint.

192.  Jones *did nothing*; he allowed his revocation of the bond cards to stand.

193.  With respect to Chief Paidousis, Knox County and KCS stated in their sworn responses to interrogatories served in the *Sanderson* lawsuit that he "self-reported" himself twice to the KCSO, both times because "he felt an obligation to report to KCSO that he had been accused of a crime."  Plaintiffs aver upon information and belief that Sheriff Jones did nothing whatsoever to investigate these ostensible crimes.

-42-

194. Instead of taking action to stop the extreme risk objectively posed by Chief Paidousis given the plethora of complaints, EEOC charges, and lawsuits – two of which were characterized as criminal by Knox County – Jones allowed him to keep his unrestricted Bond Card without question. In contrast to statements published by the Knoxville News Sentinel on or about January 6, 2016, about the Captains, Sheriff Jones did not order the revocation of the Bond Card issued to Chief Paidousis because, apparently, he saw no basis for "looking out for the residents of Knox County," and he saw no "liability for Knox County" even though "that's his job, to limit the liability to the county" – despite two reports of ostensible criminal conduct that touch on Chief Paidousis' ability to be trusted with a firearm in Knox County Schools.

## (I) <u>Allegations of Concerted Unlawful Activity</u>

195. Based on the foregoing, Plaintiffs aver and allege that the Mayor of Knox County, three KCS Superintendents, the KCS Chief Operating Officer, and all except one member of the Board refused to act against Chief Paidousis in dereliction of their statutory duties.

196. Based on the foregoing, Plaintiffs aver and allege that the Knox County government has been acting in a coordinated and corrupt manner in covering up and concealing the actions of, and protecting Chief Paidousis over protecting the safety of the KCS employees and the children who attend the Knox County Schools for some reason that remains unknown at this time.

197. Based on the foregoing facts relative to the moonshine complaints set forth in the Sanderson facts, *supra*., Plaintiff Stewart alleges that he has been retaliated against due to a coordinated cover-up involving moonshine runner Boles. Boles received a verbal warning, yet was subsequently promoted to Sergeant, made the head of training, and awarded Officer of the Year. In contrast, the whistleblower, Sergeant Sanderson, lost his Bond Card due to a knowingly false

-43-

statement by the KCSO set forth in an official document, and then had his employment terminated for making the complaint, after he was supported by Captain Stewart who was also fired. A reasonable person could conclude this was actually an extensive cover-up by the KCSO and KCS, ignored by the Knox County Mayor, to appease the wrongdoer and hide the full facts from the public in some kind of mass corruption involving illegal alcohol.

198.   Based on the foregoing, and In light of the over-riding duty to have trained Deputy Sheriff's to protect the citizens of Knox County and trained security officers to protect the children of Knox County Schools, it is objectively unfathomable that no bona fide investigation has been done outside of the involved agencies and outside of the influence of Chief Paidousis or Sheriff Jones, and that no report has been made to the citizens of Knox County or to the Knox County Board of Commissioners by Mayor Burchett after he was directly informed of these matters by the Captains. Accordingly, Plaintiffs aver and allege that, *in toto*, they have been fired to ensure that they can make no more complaints that could reach the light of day.

## VI.  <u>ADVANCE NOTICE PROVIDED TO DEFENDANTS</u>

199.   Due to the nature of the allegations set forth herein, a draft of this Complaint was provided to the Knox County law director's office on August 27, 2018, in care of the assistant law director responsible for the litigation of the Captains' case, in order to seek the input of Knox County and KCS to identify any allegation that is objectively untrue, and any claims that involve a law or defense which facially defeats such claims, so they could be addressed. <u>Exhibit H</u>. No response was ever provided by the County.

200.   Based on the invitation that was afforded to Knox County's attorneys, and their lack of a response challenging any statement set forth in the draft, Plaintiffs and their counsel now file

-44-

this Complaint with a good faith belief, to the best of their knowledge and information formed after an inquiry reasonable under the circumstances, that the claims, defenses, and other legal contentions set forth herein are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law, and that the factual contentions in this entire Complaint have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

## VII.  CAUSES OF ACTION

201.    Paragraphs 1 through 200 are hereby realleged and incorporated in full throughout this section by reference as if fully set forth herein.

202.    The actions of Defendants in engaging in systematic, continuing retaliation against Captains Ryerkerk, Stewart, and Kee for reporting a violation of the ADA and acts of race discrimination, culminating in the termination of their employment for untrue and pretextual reasons on June 14, 2016, constitutes a violation of the ADA, Title VII, and Tennessee Human Rights Act, Tenn. Code Ann. § 4-1-101 *et. seq.*

203.    To the extent divisible from the civil rights claims the actions of Defendants in engaging in terminating the employment of the Plaintiffs solely because they reported violations of laws intended to protect the public health, safety and/or welfare constitutes a violation of the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304.

204.    To the extent divisible between the Defendants, Plaintiffs aver that Defendants acted under a common plan and design to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, the violations of law being set forth and described more particularly *supra.*

-45-

205.    As the direct and proximate result of each and every of the foregoing wrongful acts of the Defendants as alleged herein, Plaintiffs have suffered damages in an amount according to proof, including but not limited to, loss of employment; loss of income, loss of other employment benefits, humiliation, expense, embarrassment, loss of his capacity to earn, damage to reputation and other incidental and consequential damages and expenses.

### VIII.  **PRAYERS FOR RELIEF**

206.    Paragraphs 1 through 205 are hereby realleged and incorporated in full throughout this section by reference as if fully set forth herein.

207.    As a result of the conduct, actions, and inactions of the Defendants herein alleged, by and through their agents acting with actual and/or apparent authority, Plaintiffs have no effective, adequate, or complete remedy at law, because Defendants continue to engage in the wrongful practices alleged herein.  Therefore, Plaintiffs pray that:

A.    The Court assume jurisdiction of this action and that process issue;

B.    Premises considered, the Court refer this matter to the U.S. Department of Justice and/or the U.S. Attorney's Office for the Eastern District of Tennessee for a complete and proper investigation in order to protect the citizens of Knox County, and the employees and students of the Knox County Schools;

C.    The Court issue a permanent injunction enjoining Defendants and their agents from engaging in the illegal and unlawful policies and practices described herein, including any further retaliation against the Plaintiffs or others bringing illegalities or wrongful conduct to the attention of any agent of either Defendant;

-46-

D.     Each Plaintiff be reinstated to his former position (or one comparable), at a rate of pay no less than that paid at the time they were first fired, and with all benefits reinstated as if their employment had not been terminated;

E.     Each Plaintiff be awarded damages for all damages alleged herein, including but not limited to back pay from the date of discharge, loss benefits, and front pay if the respective Plaintiff is not reinstated or if reinstatement is determined by the Court to not be viable;

F.     For an award of pre- and post-judgment interest;

G.     Plaintiffs be awarded their attorneys' fees and costs;

H.     The matter be tried by jury on all matters properly tried by a jury; and,

I.     For such other and further relief as the Court deems just and proper.

———

WHEREFORE, Plaintiffs respectfully pray for the relief requested herein.

*(signature page follows)*

-47-

Respectfully submitted this *12th* day of ~~August~~, *September*, 2018.

_____
DANIEL STEWART

_____
DOUGLAS RYERKERK

_____
WILLIAM KEE

**OF COUNSEL:**

_____
Dale J. Montpelier, BPR # 17125

_____
Joseph F. Della-Rodolfa, BPR # 18620

MONTPELIER DELLA-RODOLFA - ATTORNEYS
9050 Executive Park Dr., Ste A-107
Knoxville, Tennessee 37923
Telephone: (865) 673-0330

       Counsel for Plaintiffs

-48-